UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 20-cr-213 (MJD/LIB)

       Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Gerald Sean Clark,

       Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Gerald Sean Clark's ("Defendant") Motion to Suppress Evidence Obtained Through Illegal Search and Seizure (hereinafter "Motion to Suppress Evidence"), [Docket No. 55], as well as, his Pretrial Motion for Dismissal of Indictment (hereinafter "Motion to Dismiss the Indictment"). [Docket No. 24]. The Court held a Motions Hearing on July 13, 2021, regarding Defendant's pretrial Motion to Suppress Evidence.[1]

---

[1] On November 3, 2020, Defendant filed a pretrial Motion to Suppress the Search Warrant, [Docket No. 23]; Motion to Dismiss the Indictment, [Docket No. 24]; and Motions for Discovery and Production of Evidence. [Docket Nos. 22, 25-27]. On November 25, 2020, the Court subsequently held a Motions Hearing on the parties' pretrial motions. On December 4, 2020, the Court issued an Order addressing Defendant's pretrial motions for Discovery and Production of Evidence. [Docket No. 33]. The Court subsequently issued a Report and Recommendation recommending the denial of Defendant's Motion to Suppress Evidence and his Motion to Dismiss the Indictment. [Docket No. 42]. Following a change in counsel for the Defendant, an objection to the Report and Recommendation was filed. [Docket Nos. 43, 51]. On June 2, 2021, the Honorable Michael J. Davis declined to adopt the Report and Recommendation and remanded the matter "to allow Defendant's new counsel to file a new motion to suppress, for new briefing by the parties, and for any hearing necessary, . . . and for the issuance of a new Report and Recommendation. [Docket No. 53]. On June 25, 2021, Defendant then filed, among other things, a "second motion to suppress evidence obtained through illegal search and seizure." [Docket No. 55]. At the July 13, 2021, Motions Hearing, Defendant withdrew his First Motion to Suppress the Search Warrant. [Docket No. 23]. However, Defendant informed the Court that his Motion to Dismiss the Indictment, [Docket No. 24], was not specifically withdrawn but requested that the Court only address it to the extent Defendant's Motion to Suppress Evidence may be granted. (Tr. 6-7). Accordingly, the Court is including Defendant's Motion to Dismiss, [Docket No. 24], in this Report and Recommendation in an abundance of caution.

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Evidence, [Docket No. 55], and Motion to Dismiss the Indictment, [Docket No. 24], were taken under advisement.

For reasons discussed herein, the Court now recommends that Defendant's Motion to Suppress Evidence, [Docket No. 55], be **DENIED**, and Defendant's Motion to Dismiss the Indictment, [Docket No. 24], be **DENIED**.

## I.    Background and Statement of Facts

### A.  Background

Defendant is charged with one (1) count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and two (2) counts of being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 13]).

### B.  Relevant Facts

The record presently before the Court indicates that, on the evening of July 10, 2020, Minnesota State Patrol Trooper Jacob Christopherson (hereinafter "Trooper Christopherson") observed a dark colored sports utility vehicle slow down and perform a U-turn into a median crossing on Interstate 35 near mile marker 216. (See Tr. 11-12; see also Gov't's Ex. 1, at 0:00:47-0:00:53).[2] A sign in the median crossing provided that U-turns were not permitted. (Gov't's Ex. 1, at 0:00:53. Upon observing this, Trooper Christopherson activated his emergency lights to initiate a traffic stop of the vehicle.  (Tr. 12). The vehicle stopped on the shoulder of the interstate. (Gov't's Ex.1, at 0:01:29).

---

[2] Throughout this Report and Recommendation, the Court refers to the transcript of the July 13, 2021, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 62]).  Furthermore, Government's Exhibit 1 is Trooper Christopherson's dashboard camera video. At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 1. (Tr. 22-24).

Trooper Christopherson approached the vehicle wherein he observed Defendant in the driver's seat as the sole occupant in the vehicle. (Tr. 12). Trooper Christopherson explained to Defendant the reason he had initiated the traffic stop, (Gov't Ex. 1, at 0:01:47), and while doing so, he immediately observed that Defendant had an "excited demeanor"; "was frantic"; "moving around in the vehicle"; "shaking"; and Defendant's "voice quivered." [3] (Tr. 13). Trooper Christopherson asked Defendant for his license and proof of insurance at which point Defendant admitted that he did not have his driver's license with him. (Gov't Ex. 1, at 0:01:55-0:01:59). Defendant also stated that he was travelling from Duluth, Minnesota to a casino in Hinkley, Minnesota. (Tr. 14; Gov't Ex. 1, at 0:02:02-0:03:14). When Trooper Christopherson informed Defendant that, if Defendant were headed from Duluth to Hinkley then he should have originally been heading southbound as opposed to northbound, Defendant stated that he had exited the interstate to purchase food, but he drove in the wrong direction when he drove back onto the interstate. (Gov't Ex. 1, at 0:02:55-0:03:17). Defendant explained that this was the reason he made the U-turn. (Id.).

Defendant identified himself as "Jerry Sean Clark" by writing it down on the Trooper's notepad while stating that he "[doesn't] drink, do drugs, nothing." (Tr. 13; Gov't Ex. 1, at 0:02:25-0:03:20). Defendant also informed Trooper Christopherson that he was "jittery" because he did not have his license and because he did not want the vehicle towed. (Gov't Ex. 1, at 0:03:22-0:03:27). Trooper Christopherson observed that Defendant was "shaking to the point where when he wrote on [the] notepad, [Trooper Christopherson] had to clarify [Defendant's] writing because it was almost illegible." (Tr. 13; Gov't Ex. 1, at 0:03:34-0:03:43). Defendant

---

[3] See also gen., in accord, Trooper Christopherson's warrant application, which was offered into evidence at the November 25, 2020, Motions Hearing as Government's Exhibit 1, at p. 2 (providing that Trooper Christopherson observed Defendant could not remain still, but "rocked in his seat"; "shifted his body while [Trooper Christopherson] spoke to him"; "shook" his hands; and Defendant's "voice quivered.").

also informed Trooper Christopherson that the vehicle did not belong to Defendant. (Gov't Ex. 1, at 0:03:28-0:03:33). Defendant went on to further admit that his license had been suspended. (Id. at 0:03:48). Defendant continued to express that he did not want the vehicle towed, and Trooper Christopherson told Defendant the vehicle would not be.[4] (Id. at 0:04:30-0:04:33). However, because Trooper Christopherson observed that Defendant's "demeanor did not subside," he had Defendant exit the vehicle to conduct a pat search, perform a field sobriety test, and to "have a better view of him while [Trooper Christopherson] was in the squad car entering information." (Tr. 15; Gov't Ex. 1, at 0:04:26-0:04:35).

After Defendant exited the vehicle with a drink in his hand, Defendant expressed that he "ha[d] no knives, nothing"; that he was "going to be suspended"; and that he knew the vehicle was "going to get towed" to which Trooper Christopherson reassured Defendant, once more, that the vehicle would not be towed. (Gov't Ex. 1, at 0:04:56-0:05:15). Trooper Christopherson then performed a pat search of Defendant, and Defendant once again stated that he had no knives. (Tr. 15; Gov't Ex. 1, at 0:05:15-0:05:20). However, the pat search yielded a pocketknife in Defendant's left pant pocket. (Tr. 15; Gov't Ex. 1, at 0:05:22-0:05:33).

Trooper Christopherson then went to his patrol vehicle and instructed Defendant to remain where he was standing. (Gov't Ex. 1, at 0:05:45-0:05:57). In Trooper Christopherson's dashboard camera ("dashcam") footage, Defendant can be seen pacing, cupping his face in his hands, and placing his hands in and out of his pockets. (Id. at 0:05:40-0:05:53). Defendant then signaled to Trooper Christopherson that he would like a cigarette, but Trooper Christopherson reminded Defendant to stand by his vehicle. (Id. at 0:05:54-0:06:06). Defendant then asked, "Can I please grab one? Please. Real quick. Please." (Id. at 0:06:03-0:06:08). Trooper Christopherson

---

[4] See also gen., in accord, Trooper Christopherson's warrant application, which was offered into evidence at the November 25, 2020, Motions Hearing as Government's Exhibit 1, at p. 2-3 (providing that Trooper Christopherson also observed sweating and "frantically repeating [to] himself about not wanting the vehicle to be towed.").

permitted Defendant to obtain the cigarettes from the front passenger side of the vehicle, but he did not at that time permit Defendant to smoke.  (Id. at 0:06:06-0:06:34).

Trooper Christopherson then began conducting a field sobriety test on Defendant.  (Gov't's Ex.1, at 0:06:34-0:10:25).  At the July 13, 2021, Motions Hearing, the Trooper testified that he conducted this field sobriety test because he believed Defendant's behaviors were common indicators of impairment.  (Tr. 16).  Defendant can be seen visibly shaking, moving restlessly, and rubbing his hands; at one-point stating, "I'm just really nervous, man"; "my knees are shaking"; and "I'm nervous as hell."  (Gov't's Ex. 1, at 0:10:25-0:10:28; 0:13:33; 0:14:24-0:14:57).  Trooper Christopherson reassured Defendant to "take a deep breath," "relax," and take a minute so Defendant could do the best he could because Trooper Christopherson understood that it was "nerve-wracking."  (Id. at 0:10:42-0:10:45).

Defendant once more expressed concern about the vehicle being towed.  (Gov't's Ex. 1, at 0:15:48-0:15:56).  Trooper Christopherson then asked Defendant "when was the last time [he] used" to which Defendant responded, "I don't use . . . I'm just really nervous."  (Id. at 15:59-16:05).  Defendant informed Trooper Christopherson that he had a prescription for Adderall for his "ADD"; last took Adderall earlier in the evening at 5:30 p.m.; and had been taking Adderall "everyday" for "all of his life."  (Id. at 0:16:15-0:16:52).  After passing the field sobriety test, Defendant was permitted to smoke his cigarette while Trooper Christopherson returned to the police vehicle.  (Tr. 43; Gov't's Ex. 1, at 0:16:52-0:17:11).

Trooper Christopherson then began entering the information Defendant provided into the computer system.  (Tr. 17; Gov't's Ex. 1, at 0:17:10).  While Trooper Christopherson entered this information, he had to again remind Defendant to stand by his vehicle.  (Gov't's Ex. 1, at 0:17:10-0:18:05).  Trooper Christopherson then learned that there was a Wisconsin Department of Corrections arrest warrant, which he believed belonged to Defendant, for, among other things,

possession of a controlled substance. (Tr. 17-18; Gov't's Ex. 1, at 0:18:05-0:20:19). Trooper Christopherson asked dispatch to confirm the warrant. (Id.). Trooper Christopherson also learned that Defendant's driving status in Minnesota had been revoked. (Tr. 17; Gov't's Ex. 1, at 0:19:09-0:19:13).

Trooper Christopherson exited the patrol vehicle and approached Defendant to confirm the spelling of his first name to which Defendant responded that his full name was "Gerald" stating, "I'm revoked, for sure, I am," and providing that he had a copy of his identification in his vehicle. (Tr. 18; Gov't's Ex. 1, at 0:20:30-0:21:01). While Defendant opened and entered the driver's side of the vehicle and attempted to find his identification, Trooper Christopherson observed a cloth camera case on the floor of the vehicle near the pedals in front of the driver's seat where the driver's feet would be located. (Tr. 18-19; Gov't's Ex. 1, at 0:21:07-0:21:20). When Trooper Christopherson asked Defendant what was in the camera case, Defendant "grabbed the camera case and frantically threw it into the passenger side of the vehicle." (Tr. 19). Defendant said he did not know the contents of the case because it was not his vehicle. (Id.)

Defendant then exited the vehicle with another cigarette and a cellphone in his hand, but he was unable to locate a copy of his identification. (Gov't's Ex. 1, at 0:21:36). Defendant was instructed to stand by his vehicle while Trooper Christopherson entered the patrol vehicle once more. (Id. at 0:21:40-0:21:43). Seconds later, Defendant asked Trooper Christopherson for permission to make a phone call, and he was permitted to do so. (Id. at 0:21:45-0:22:06).

After confirming Defendant's full name, Trooper Christopherson exited his police vehicle to inform Defendant about the existence of the Wisconsin Department of Correction arrest warrant, and that Defendant would need to be detained until it was determined whether the warrant had an extradition request. (Tr. 19-20; Gov't's Ex. 1, at 0:27:20-0:28:07). Defendant was handcuffed, pat searched, and placed in the rear of Trooper Christopherson's patrol vehicle. (Gov't's Ex. 1, at

6

0:28:25-0:28:48). During this process, a second officer arrived at the location, and Trooper Christopherson can be heard informing the officer that Defendant was stopped for a traffic violation; that Defendant was "super jittery and everything"; that Defendant admitted his license was revoked; that Defendant had a Wisconsin DOC warrant; and that the vehicle will be towed if Defendant is held on the warrant. (Id. at 0:28:57-0:29:34).

Thereafter, dispatch confirmed the warrant was valid and that it had an extradition request, Trooper Christopherson had Defendant step out of the patrol vehicle to adjust his handcuffs and remove his jewelry. (Id. at 0:31:21-0:32:07). Defendant was then informed that, because the arrest warrant did have an extradition request, Defendant would be placed under arrest. (Tr. 20-21; Gov't's Ex. 1, at 0:32:57-0:33:07). Defendant was arrested, searched, and placed once more in the rear of Trooper Christopherson's patrol vehicle. (Tr. 21; Gov't's Ex. 1, at 0:33:07-37:24). The search of Defendant's person yielded keys, coins, cash in the amount of $4,541, cigarettes, and a lighter. (Id.). Trooper Christopherson then called for a tow truck.[5] (Tr. 24; Gov't's Ex. 1, at 0:39:30-0:39:34).

While waiting for the tow truck, Trooper Christopherson performed an inventory of the vehicle's contents. (Tr. 28; Gov't's Ex. 1, at 0:40:02-1:14:32). In doing so, Trooper Christopherson located a pair of brass knuckles in the vehicle's center console; a plastic spoon containing residue, which later "NIK tested" positive as methamphetamine, and which was located in the pocket on the back of the front right passenger seat; a box of twenty-three ".410 shotgun shells" in the vehicle's glovebox; a wooden baton between the driver's seat and the center console;

---

[5] Trooper Christopherson testified that he relied on the Minnesota State Patrol Policy No. 09-20-006, "Towing and/or Placing Vehicles in Custody," which provides that "Vehicles may be towed . . . [when] the driver/owner is subject to custodial arrest . . . and there is no qualified driver immediately available who the owner will authorize to operate the vehicle." See Government's Exhibit 4, at § B(4), which was offered into evidence at the Motions Hearing without objection. (Tr. 27).

and a "Ruger LCP .380 Caliber handgun . . . with 7 .380 caliber bullets in the magazine well," which was located in an open compartment directly beneath the vehicle's radio between the front driver's seat and the front passenger's seat.[6] (Tr. 31).

Inside the cloth camera bag, Trooper Christopherson found "a glass pipe with [m]ethamphetamine residue, a metal scoop device with residue, a plastic baggie containing a packed weight of 1.12g of substance NIK tested positive as [m]ethamphetamine, and a plastic container containing .2g of substance NIK tested positive as [m]ethamphetamine."[7] (Tr. 32).

Trooper Christopherson also located in the trunk of the vehicle three firearm magazines, including one magazine "loaded with 27 7.62x39 rounds"[8] and three bags containing, among other things, "miscellaneous cleaners," "adhesive," "brake cleaner," "floor cleaner," "batteries," "miscellaneous hand tools," a "crowbar," and a "cordless angle grinder." (Gov't Ex. 1, at 0:44:00-0:46:03). Trooper Christopherson also located in the trunk, among other things, "motor oil," a "vehicle lock-out kit," and "jumper cables." (Id. at 0:46:03-00:52:00). The tow truck then arrived on the scene. (Id. at 0:53:13).

After completing the roadside inventory of the vehicle's contents, Trooper Christopherson informed the tow truck driver to take the vehicle to the "district's office." (Id. at 1:14:24-1:15:00). Trooper Christopherson then transported Defendant to the Carlton County jail. (Tr. 21).

Pursuant to the Minnesota State Patrol Policy for "Towing and/or Placing Vehicles in Custody," Trooper Christopherson prepared a custody report. (Gov't Ex. 3). Trooper Christopherson provided the vehicle information, the name of the owner of the vehicle, and that the vehicle was impounded because of an arrest. (Id.). Trooper Christopherson also provided a

---

[6] See also gen., in accord, Trooper Christopherson's warrant application, which was offered into evidence at the November 25, 2020 Motions Hearing as Government's Exhibit 1, at p. 10-11.

[7] Id.

[8] Id.

description of property identified and inventoried as "two compound bows, misc chargers, misc cordless power tools, misc hand tools, misc clothes and blankets." (Id.).  Trooper Christopherson did not include the weapon and contraband discovered in the vehicle on the custody report.  (Id.).

## II.   DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [Docket No. 55].

Defendant moves the Court for an Order suppressing all evidence obtained as a result of the search of Defendant's vehicle.   (Def.'s Mot. [Docket No. 55]).   In support of this request, Defendant initially asserted in his written Motion that Trooper Christopherson had neither "probable cause" nor "reasonable articulable suspicion" to search Defendant's vehicle.  (Id.). Specifically, Defendant contended that, because the purpose of the stop had been concluded before the search of the vehicle began, "[t]he decision to impound the vehicle was made in bad faith and an investigatory search was conducted in the guise of an inventory search." (Id.).  Defendant further asserted that Trooper Christopherson failed to comply with the Minnesota State Patrol's inventory search policy when, "without reasonable, articulable suspicions," Trooper Christopherson began searching the vehicle before lawfully impounding it.  Lastly, Defendant contended that he was detained for an "unreasonable extended period of time" while Trooper Christopherson "expanded the scope of the stop beyond what was reasonably necessary to effectuate the purpose of the stop." (Id.).

On August 3, 2021, Defendant filed his supplemental memorandum of support of the present Motion.  (Def.'s Mem. [Docket No. 63]).  In this memorandum, Defendant does not now directly challenge the initial stop of Defendant's vehicle.  Instead, Defendant argues more narrowly that the search of his vehicle was not a valid inventory search and "the evidence seized must be suppressed."   In support, Defendant argues that Trooper Christopherson "failed to follow his agency's inventory search policy"; that the search conducted was a "purely investigatory search of the vehicle under the guise of an inventory search"; that the inventory search was unreasonable

9

because "[Trooper Christopherson] knew someone was coming to pick up the [vehicle], but impounded [it] . . . as a pretext to search it; that Defendant's nervous actions was not a valid basis for "reasonable articulable suspicion"; and that <u>Terry</u> would not justify the search . . . because the defendant was already under arrest and in the squad vehicle prior to the search."  (Def.'s Mem., [Docket No. 63], at pp. 9-27).

### A.  Traffic Stop

As discussed above, Defendant does not now directly challenge the validity of the initial stop of his vehicle.  Defendant does appear to challenge the length of the traffic stop on the basis that "nervous[ness] during a traffic stop does not warrant renewed detention . . . after [the] initial traffic stop."  (<u>Id.</u> at pp. 22-26).  The Government asserts that Trooper Christopherson was justified in stopping Defendant's vehicle for a traffic violation, and that Defendant's behavior, along with the discovery of an extraditable warrant, all resulted in the brief extension of the stop, and his ultimate arrest.  (Gov't's Res., [Docket No. 65], at pp. 5-8).

### 1.  Standard of Review

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV.  A traffic stop constitutes a seizure under the Fourth Amendment. <u>United States v. Peralez</u>, 526 F.3d 1115, 1119 (8th Cir. 1994).  It is well-established that law enforcement officers may make an investigatory stop of a vehicle if they have a reasonable and articulable suspicion of criminal activity.  <u>See, e.g.</u>, <u>United States v. Tamayo-Baez</u>, 820 F.3d 308, 312 (8th Cir. 2016); <u>United States v. Hightower</u>, 716 F.3d 1117, 1119 (8th Cir. 2013); <u>United States v. Bustos–Torres</u>, 396 F.3d 935, 942 (8th Cir. 2005).

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstances which gave rise to the stop.

Rodriguez v. United States, 575 U.S. 348, 353 (2015); Terry v. Ohio, 392 U.S. 1, 20 (1968); see also United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). "The scope of a Fourth Amendment intrusion 'will vary to some extent with the particular facts and circumstances of each case.'" United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "The scope of the detention must be carefully tailored to its underlying justification." Royer, 460 U.S. at 500. "A traffic stop can become unlawful, however, if it is 'prolonged beyond the time reasonably required' to complete its purpose." United States v. Olivera-Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). Accordingly, for an officer to lawfully prolong a stop beyond the time reasonably necessary to complete the tasks relating to the basis for the stop, the officer must have a reasonable articulable suspicion of further criminal activity. Rodriguez, 575 U.S. at 355.

"Reasonable suspicion exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from the facts, reasonably warrant suspicion that a crime has been committed.'" Tamayo-Baez, 820 F.3d at 312 (quoting United States v. Givens, 763 F.3d 987, 989 (8th Cir. 2014)); United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotations marks omitted). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." Tamayo-Baez, 820 F.3d at 312. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." Navarette v. California, 134 S. Ct. 1683, 1687 (2014).

The inquiry into whether reasonable suspicion exists considers whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21-22. It is an objective standard based on the information known to the officers at the time of the seizure. United States v. Hamilton, 591 F.3d 1017, 1022 (8th Cir. 2010). A reviewing court utilizes a totality of the circumstances analysis to determine whether reasonable suspicion exists. Hughes, 517 F.3d at 1016.

### 2. Analysis

While Defendant does not now challenge the validity of his initial stop, the record before the Court clearly indicates that Trooper Christopherson had reasonable, articulable suspicion to initiate a traffic stop of Defendant's vehicle. Trooper Christopherson testified, and his dashcam footage revealed, that, despite a clear sign that U-turns were not permitted, Defendant performed a U-turn into the median crossway of the interstate in violation of Minn. Stat. Ann. § 169.305(1)(b).[9] The Eighth Circuit Court of Appeals has repeatedly held that any traffic violation, no matter how minor, will provide at least a reasonable, articulable basis to justify a traffic stop. United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008). Accordingly, the Court finds that Trooper Christopherson had reasonable suspicion to initiate a traffic stop of Defendant's vehicle.

Defendant contends that his detention after the initial stop was unlawful because "nervousness is not a valid basis for reasonable articulable suspicion." However, the investigation following the stop was not based solely on "nervousness." The present record establishes that each action taken by Trooper Christopherson following the initial traffic stop was further justified.

If, during a traffic stop, an officer develops reasonable, articulable suspicion that criminal activity has occurred or is occurring, "he has 'justification for a greater intrusion unrelated to the

---

[9] See Minn. Stat. Ann. § 169.305(1)(b) ("When special crossovers between the main roadways of a controlled-access highway are provided for emergency vehicles or maintenance equipment and such crossovers are signed to prohibit "U" turns, it shall be unlawful for any vehicle . . . to use such crossover.").

traffic offense.'" United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (quoting Bloomfield, 40 F.3d at 918); see also United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003) ("an investigative stop can grow out of a traffic stop as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop."). "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" Sanchez, 417 F.3d at 975 (quoting United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997)). "[T]he proper scope of an investigative detention depends upon the purposes of the stop and requires using the least intrusive means reasonably available to achieve those purposes." United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986), cert. denied, 479 U.S. 861 (citing United States v. Jones, 759 F.2d 633, 642 (8th Cir. 1985)).

The Court considers the totality of the circumstances, based on common sense judgments and inferences about human behavior when determining whether an officer had "at least a minimal level of objective justification" for prolonging a traffic stop. United States v. Stringer, 739 F.3d 391, 395 (8th Cir. 2014) (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).

Here, while initially speaking to Defendant during the traffic stop, Trooper Christopherson informed Defendant of why he was stopped, asked Defendant where he was driving from and his destination, and asked for defendant's driver's license and insurance information. Trooper Christopherson was permitted to make these inquiries. See United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (holding that "[t]he Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of the vehicle and over to the patrol car, inquire into the driver's destination and purpose for the trip, and 'undertake similar questioning of the vehicle's occupants to verify the information provided by the

driver.'").  In response to Trooper Christopherson's inquiry, Defendant indicated that he did not have either vehicle registration or a license, and that his driver's license was suspended.  To confirm his identity, Trooper Christopherson asked Defendant to write his name on a notepad, which Trooper Christopherson described as practically illegible because Defendant was shaking. Furthermore, Defendant initially failed to give his proper full name requiring Trooper Christopherson to confirm his identity twice.  Accordingly, Trooper Christopherson was justified in prolonging the traffic stop in order to confirm Defendant's identity.  See United States v. Cloud, 594 F.3d 1042, 1045 (8th Cir. 2010) ("a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification").

Further, while investigating Defendant's identity, Trooper Christopherson was also permitted to asked Defendant to step out of the vehicle.  "Officers who have conducted a lawful Terry stop of a vehicle may order the driver to exit the vehicle pending completion of the stop." United States v. Spotts, 275 F.3d 714, 719 n. 2 (8th Cir. 2002).  Not only was Trooper Christopherson justified in ordering Defendant to exit the vehicle pursuant to a valid traffic stop, it was also necessary in order to conduct an accurate assessment of Defendant's identity.  See United States v. Stoltz, No. 11-cr-96 (RHK/LIB), 2011 WL 2533919 (D. Minn. June 27, 2011), aff'd, 683 F.3d 934 (8th Cir. 2012) (holding that the officer was permitted to ask Defendant to exit the vehicle to confirm his identity during a routine traffic stop).

The Court also finds that Trooper Christopherson was permitted to conduct a Terry pat down search of Defendant upon his exiting from the vehicle.  "After stopping the suspect, officers may take such 'additional steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001) (quoting Doffin, 791 F2d at 120).

In the present case, Trooper Christopherson testified that, while initially speaking to him, Defendant had an excited demeanor, his voice quivered, and he could not remain still. Defendant was frantic, moving around inside the vehicle, sweating, shaking, rocking in his seat, and shifting his body. Trooper Christopherson continued questioning Defendant, and he learned that Defendant was travelling in the wrong direction relative to his stated destination, did not have his driver's license, and did not own the vehicle. Defendant also admitted that he was jittery because, among other things, he did not want the vehicle towed. Although Trooper Christopherson assured Defendant he was not then going to tow the vehicle, Defendant's demeanor remained frantic. Trooper Christopherson testified at the July 13, 2021, Motions Hearing that Defendant's "excited demeanor . . . the tremors and movements . . . were possible indicators of impairment from various substances." (Tr. 16). Furthermore, based on his experience in law enforcement, Trooper Christopherson believed that the casino in Hinkley, Minnesota was a "known drug pickup location" and that Defendant was potentially in the process of acquiring "controlled substances for distribution."[10]

"Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction." Bustos-Torres, 396 F.3d at 944 (citing United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997)). This holding has been repeatedly adopted by the Eighth Circuit. See United States v. Gaffney, 789 F.3d 866, 870 (8th Cir. 2015); United States v. Crippen, 627 F.3d 1056, 1063 (8th Cir. 2010); United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009) (noting the defendant's "actions created a reasonable suspicion that he was involved in drug trafficking, which on its own justified the protective pat-down."). Therefore,

---

[10] See Trooper Christopherson's warrant application, which was offered into evidence at the November 25, 2020, Motions Hearing as Government's Exhibit 1, at pp. 11-12.

because Trooper Christopherson had a reasonable suspicion that Defendant was impaired and may be involved with the use of drugs, Trooper Christopherson's <u>Terry</u> pat-down for safety was constitutionally permitted under the circumstances.  See <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 790-91 (8th Cir. 1999).

The Court also finds that Trooper Christopherson was permitted to perform a field sobriety test after conducting a <u>Terry</u> pat down search of Defendant.  Here, in addition to the facts above, dashcam footage further reveals that, after being pat searched, Defendant did not remain still while standing by his vehicle in contradiction to Trooper Christopherson's orders.  Specifically, Defendant can be seen pacing, fidgeting, taking deep breaths, rubbing his bands, and requesting a cigarette before undergoing the field sobriety test.  Indeed, Trooper Christopherson testified at the Motions Hearing that Defendant's "excited demeanor . . . the tremors and movements . . . were possible indicators of impairment from various substances," and in his training and experience, Defendant's request for a cigarette in the middle of a traffic stop was strange behavior but consistent with an individual who anticipated being placed into custody.  (Tr. 16).  Furthermore, during the field sobriety test, the dashcam footage revealed that Defendant was visibly shaking, moving restlessly and can be heard admitting that his knees were shaking because he was "nervous as hell."  Defendant at one point even seems to acknowledge that he might appear impaired when he responded to Trooper Christopherson, "I don't use, I'm just really nervous."

Accordingly, given his observations, the Court finds that Trooper Christopherson had reasonable, articulable suspicion to believe that Defendant was impaired warranting a field sobriety test.  See <u>United States v. Rekonnen</u>, No. 07-cr-123 (JNE/RLE), 2007 WL 2973840, at * 15 (D. Minn. Oct. 9, 2007) (concluding that an officer had reasonable suspicion to conduct field sobriety tests despite the fact that he did not smell alcohol on the defendant); <u>see also</u> <u>United States v. Gregory</u>, 302 F.3d 805, 809 (8th Cir.2002); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 n. 6

(1977) ("We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

After Defendant passed the field sobriety test, there was only a further brief extension of the stop to confirm his identity, to confirm the validity of a Wisconsin Department of Correction arrest warrant, to confirm that the arrest warrant had an extraditable provision, and, only then, to ultimately arrest Defendant.  "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)).  When complications arise carrying out these tasks, "police may reasonably detain a driver for a longer duration than when a stop is strictly routine." United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007).

Here, Trooper Christopherson's dashcam footage reveals that, after Defendant passed the field sobriety test, Trooper Christopherson entered the patrol vehicle to enter Defendant's information into the computer system.  Approximately one minute later, Trooper Christopherson learned about the existence of the Wisconsin arrest warrant, and that Defendant's driving status in Minnesota was revoked.  After Trooper Christopherson asked dispatch to confirm the validity of the warrant, he approached Defendant and learned from him that his first name was actually "Gerald."  Defendant then offered to provide Trooper Christopherson with a copy of his identification, which Defendant stated was in his vehicle.  Dashcam footage then shows Defendant entering the driver's side of his vehicle and attempting to find a copy of his identification, while Trooper Christopherson is standing behind him.

Approximately one minute later, Defendant exits the vehicle unable to find any identification. Trooper Christopherson then enters his vehicle once more to confirm Defendant's now corrected full name. At this point, the duration at which Trooper Christopherson briefly extended the traffic stop was reasonable—he was still attempting to verify Defendant's identity, criminal history, and outstanding warrant information. See, e.g., United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008) (providing that a traffic stop can last as long as reasonably necessary to conduct a criminal history check; conduct computer searches to verify driver information; and conduct a routine investigation, including asking the driver his destination, inquiring into the purpose of his trip, and asking him to step out of the vehicle).

Approximately five minutes later, when Trooper Christopherson confirmed the validity of Defendant's arrest warrant, the Terry stop evolved into a constitutionally proper arrest based on probable cause. See United States v. Willis, 967 F.2d 1220, 1224 (8th Cir.1992) (holding that probable cause for arrest exists when police know that an individual has outstanding warrants).[11] Indeed, Defendant was ultimately arrested because the Wisconsin arrest warrant did have an extradition request. (Id. at 20-21). Defendant was then searched incident to a lawful arrest, and he was placed in the rear of the patrol vehicle.

Defendant argues in his memorandum that Trooper Christopherson could not have had a reasonable, articulable suspicion to prolong the traffic stop based on Defendant's nervousness alone. However, as noted above, given the totality of circumstances, there were several factors Trooper Christopherson considered in each investigative step—only one of which included nervousness. Furthermore, Defendant's contention that no weapon was found on his person is contradicted by the dashcam footage, which provides that the pat search revealed a pocketknife in

---

[11] That Trooper Christopherson testified he had previously only detained Defendant for his safety and would have released him if the arrest warrant did not have an extraditable provision does not vitiate probable cause.

Defendant's left pant pocket.  Moreover, Defendant's general notion that his passage of the field sobriety test should have terminated the stop is misplaced.

On the totality of the circumstances, the Court concludes that the observations of Trooper Christopherson <u>after</u> stopping Defendant for performing an illegal U-turn are independent articulable facts that created an objectively reasonable suspicion of additional criminal activity sufficient to briefly extend the stop in order to confirm Defendant's identity, conduct a <u>Terry</u> pat-down search of Defendant for weapons, perform a field sobriety test, and to confirm the validity of the outstanding Wisconsin arrest warrant; all of which occurred without undue delay immediately after the initial stop of the vehicle.

Accordingly, to the extent Defendant's Motion to Suppress Evidence, [Docket No. 55], seeks an Order of this Court suppressing all evidence flowing from the July 10, 2020, investigatory stop of Defendant's vehicle on the basis that said stop was at its inception constitutionally impermissible or unreasonably prolonged, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 55], be **DENIED**.

### B.  Inventory Search

The remaining arguments advanced in Defendant's supplemental memorandum of law challenge the search of Defendant's vehicle following his arrest on the Wisconsin warrant.  (Def.'s Mem. [Docket No. 63]).  Specifically, Defendant argues that it was unreasonable for Trooper Christopherson to tow Defendant's vehicle; that the search was purely investigatory; and insofar as the search was an inventory search, Trooper Christopherson failed to comply with Minnesota State Patrol's inventory search policy.  The Government contends that Trooper Christopherson was justified in conducting an inventory search and having the vehicle towed.

## 1. Standard of Review

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).  A lawful inventory search is one of those exceptions.  United States v. Frasher, 632 F.3d 450, 454 (8th Cir. 2011) ("[i]nventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment.").

When towing and impounding a vehicle, an officer "may conduct a warrantless search and inventory in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger." United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001).  The search must be reasonable in light of the totality of the circumstances.  Id.  "[I]nventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." United States v. Marshall, 986 F.2d 1171, 1174 (8th Cir. 1993).  The Government bears the burden of showing that its conduct complied with the inventory search exception to the warrant requirement. United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2010).

## 2. Analysis

The Government argues that Defendant's vehicle was lawfully searched and towed pursuant to Sections III(B)(4) and III(B)(5) of the Minnesota State Patrol's policy for towing and placing vehicles in custody.  (Gov't Ex. 4, at III(B)(4)-(5)).  The policy permits towing when the driver "is subject to custodial arrest . . . and there is no qualified driver immediately available who the owner will authorize to operate the vehicle" or where any vehicle authorized or unattended "constitutes an accident or traffic hazard to the traveling public."  (Id.).  Trooper Christopherson

testified, specifically referring to Sections III(B)(4) and (5), that he towed the vehicle because Defendant, who was the driver and the only occupant of the vehicle, was being taken into custody, and because the topography of the interstate at that location presented a hazard to the traveling public. (Tr. 28). Trooper Christopherson also testified that, while he has discretion to tow, it is his common practice to tow a vehicle when an individual driver is arrested. (Tr. 28).

Defendant argues that it was unreasonable for Trooper Christopherson to tow Defendant's vehicle because Defendant had made arrangements for a friend to drive it from the location. In support, Defendant maintains that Trooper Christopherson can be heard on the dashcam footage telling Defendant he could call someone to pick up the vehicle. This argument is unsupported by the record. The only audio discernable is Trooper Christopherson permitting Defendant to make a phone call. There is no indication on the record now before the Court that Defendant informed Trooper Christopherson that he had in fact made any actual arrangements for a friend to drive the vehicle. Moreover, even if Trooper Christopherson was aware that Defendant was making arrangements, "[n]othing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory." United States v. Agofsky, 20 F33d 866, 873 (8th Cir. 1994).

Furthermore, to the extent Defendant argues that Trooper Christopherson told Defendant he would not have the vehicle towed, these assurances were made before he had knowledge of the outstanding Wisconsin arrest warrant. Consistent with Trooper Christopherson's common practice, he only called for a tow truck after he arrested Defendant for the outstanding arrest warrant. Indeed, Trooper Christopherson was permitted to use his discretion in towing the vehicle pursuant to the department's policy. See United States v. Arrocha, 713 F.3d 1159, 1162 (8th Cir.2013) (quoting Colorado v. Bertine, 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987))

("[t]he Fourth Amendment permits exercise of such discretion . . . 'so long as that discretion is exercised according to standard criteria . . . other than suspicion of evidence of criminal activity.'").

Defendant also contends that Trooper Christopherson could have easily transferred custody of the vehicle to Defendant's friend, Danielle Butler, because she drove to the scene and was waiting to be allowed to take possession of the vehicle. Here, again, Defendant's assertion is unsupported by the factual record. Ms. Butler's own testimony at the July 13, 2021, Motions Hearing directly contradicts this contention. Ms. Butler testified that, after receiving a phone call from Defendant to come and pick up the vehicle, she pulled over on the opposite, northbound side of the interstate and could see Defendant and Trooper Christopherson from across the median. (Tr. 80). Ms. Butler never actually approached the scene to inform Trooper Christopherson that she had arrived and would take the Defendant's vehicle, which is supported by the dashcam footage. (Tr. 83). Therefore, Trooper Christopherson could not have in fact transferred custody of the vehicle to Ms. Butler.

Based on Trooper Christopherson's testimony and his dashcam footage, the Court finds that the criteria for towing Defendant's vehicle under Sections III(B)(4) and (5) are met. Defendant was arrested for an outstanding arrest warrant and his vehicle was parked at night on the side of the I-35 interstate. Dashcam footage supports that it was a high traffic area, which could have resulted in roadside loss and constituted a public hazard. Accordingly, Trooper Christopherson had a lawful basis for towing Defendant's vehicle.[12]

---

[12] To the extent Defendant argues that Trooper Christopherson's sole motivation for towing the vehicle was to investigate for drugs, the Court finds that, because Trooper Christopherson had an objectively reasonable articulable suspicion of a criminal activity on which to initially stop the vehicle, and ultimately to arrest the Defendant on the basis of an outstanding warrant, the mere fact that Trooper Christopherson may have also believed drugs may have been present is irrelevant. Whren v. United States, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions play no role in Fourth Amendment analysis subject to an objective evidence standard).

When towing a vehicle, a warrantless search and inventory is permitted in order to protect Defendant's property, to protect the police against claims of stolen or lost property, and to protect the police from possible danger.   Hartje, 251 F.3d at 775.   However, in the totality of the circumstance, the search must be reasonable and conducted according to standardized police procedures.  Id.; see also United States v. Marshall, 986 F.2d 1171, 1174 (8th Cir. 1993).

The Government maintains that the Minnesota State Patrol has a clear inventory policy, which requires that "troopers 'conduct a detailed inspection and inventory of all impounded vehicles,' including 'the opening of all containers and the listing of their contents,'" and that Trooper Christopherson complied with the department's policy. (Gov't Ex. 2, at II(A)(1)).

Here, after Defendant's arrest, Trooper Christopherson began a roadside inventory search of the vehicle while waiting for the tow truck, which included cataloging various items within the vehicle, such as two compound bows, miscellaneous chargers, power tools, hand tools, clothes, and blankets.  Trooper Christopherson also seized items that he came across in the course of the inventory search that he thought might subsequently be of evidentiary value, such as a pair of brass knuckles, a plastic spoon containing methamphetamine, and a "Ruger LCP .380 Caliber handgun." Trooper Christopherson testified that, in compliance with department policy, he completed the Minnesota State Patrol's Custody Report itemizing the miscellaneous items found and left in the vehicle, but he did not include on the Report those items seized for possible evidentiary purposes as "they were no longer in the vehicle to be noted on the inventory form."  (Tr. 58).

Defendant argues that Trooper Christopherson did not comply with the department's policy because he failed to inventory on the Custody Report all the items observed in the vehicle.[13] Specifically, he arguably failed to inventory "three large red bags of tools, five impact drills,

---

[13] Defendant also argues that Trooper Christopherson failed to inventory duffle bags with clothes, artwork, and art supplies.  (Def's Mem. [Docket No. 63], at p. 7).  Defendant relies on Zoe Driskell's testimony at the July 13, 2021, Motions Hearing.  However, this is a mischaracterization of Ms. Driskell's testimony.  In fact, Ms. Driskell testified

various containers of spray cleaners, a crowbar, tool batteries, a Sawzall, angle grinders, angle grinder blades, a vehicle lockout kit, jumper cables, a DeWalt portable shop vacuum, a car stereo amplifier, or a large subwoofer speaker enclosure."  (See Def.'s Mem., [Docket No. 63], at p. 7). Defendant argues that failing to inventory all these non-evidentiary items is grounds for suppression.  However, the Court finds this argument unpersuasive.

Failing to inventory all the items actually in the vehicle does not invalidate an otherwise valid inventory search.  See United States v. Rowland, 341 F3d 774, 780 (8th Cir. 2003) ("Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search."); see also United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) ("Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's caretaking function.  This does not mean that inventory searches are always unreasonable when standard procedures are not followed, however.").[14]  The Court finds that Trooper Christopherson substantially complied with the department's policy sufficient to vitiate concerns of an investigatory motive.

Defendant next argues that the search of his car was purely investigatory under the guise of an inventory search.  However, this argument fails on its face because, even if true, a concurrent

---

that she did not know if her items were in the vehicle at the time Defendant was stopped.  (Tr. 67).  Furthermore, to the extent Defendant relies on Ms. Driskell's testimony that the pistol in the vehicle was hers to argue that he had no knowledge the Ruger pistol was in the vehicle, the Court notes that this is merits-based testimony of the offense charged, and it has no relevance in Defendant's Motion to Suppress Evidence.  However, to the extent Defendant proffers this as a defense argument for Defendant's pending Motion to Dismiss the Indictment, [Docket No. 24], as noted below, the Court nevertheless still recommends that the Motion to Dismiss the Indictment be denied for the reasons put forth in the original Report and Recommendation.  [Docket No. 42].

[14] Defendant argues that "no inventory 'Custody Report' form PS 01818, as required by State Patrol policy, was provided to defense counsel through discovery."  (Def's Mem. [Docket No. 63], at p. 20).  While Defendant's exact challenge now is unclear, to the extent Defendant challenges the Custody Report form based on a purported lack of foundation or authenticity, Defendant waived any such objections when the Custody Report form was admitted into evidence at the July 13, 2021, Motions Hearing as Government's Exhibit 3, without objection.  (Tr. 30).  Furthermore, to the extent Defendant argues that he was prejudiced based on the limited time to review the exhibit prior to the Motions Hearing, Defendant had Government's Exhibit 3 for 21 days before he was required to submit his memorandum in support of his Motion to Suppress Evidence.  Accordingly, neither of these arguments support suppression.

subjective interest to investigate while performing a caretaking function pursuant to a standardized police procedure will not invalidate a lawful inventory search.  See United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999) ("[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search."); United States v. Petty, 367 F.3d 1009, 1013 (8th Cir. 2004) ("[t]hat an officer suspects he might uncover evidence in a vehicle, however, does not preclude the police from towing a vehicle and inventorying the contents, as long as the impoundment is otherwise valid."); Marshall, 986 F.2d at 1176 (quoting United States v. Rodriguez–Morales, 929 F.2d 780, 787 (1st Cir. 1991) (explaining that "[a]s long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure.").  "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable."  United States v. Kennedy, 427 F.3d 1136, 1143 (8th Cir. 2005).  Whether he had any secondary intent to investigate a crime is immaterial, once Trooper Christopherson had lawfully decided to impound and tow the vehicle, he was acting pursuant to a department policy in executing an inventory search.

Considering the totality of the facts and circumstances of this particular case, the Court finds that the inventory search was reasonable.  Trooper Christopherson conducted the inventory search only after Defendant was arrested on an outstanding Wisconsin arrest warrant and after calling for a tow truck.  Trooper Christopherson then performed an inventory search prior to towing, per the Minnesota State Patrol's policy.  Trooper Christopherson substantially complied with the department's policy in inventorying the items left in the car to protect the department against claims.  The Court also finds that Defendant's behavior in grabbing and throwing the cloth camera case when questioned about its contents rendered it reasonable for Trooper Christopherson

to conduct an inventory search of the vehicle to ensure officer safety.   Accordingly, the inventory search was constitutionally permissible.

Therefore, to the extent Defendant's Motion to Suppress Evidence, [Docket No. 55], seeks an Order of this Court suppressing all evidence obtained as a result of the July 10, 2020, search of the vehicle he was driving, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 55], be **DENIED**.

## III.    DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

On November 3, 2020, Defendant filed a Motion to Dismiss the Indictment.  [Docket No. 24].  In his Motion, Defendant asserted only that "there is no probable cause to show [he] possessed any" firearms or ammunition "at the time of the incident."  (Def.'s Mot. [Docket No, 24]). While Defendant was granted the opportunity to submit supplemental briefing on this Motion at the November 25, 2020, Motions Hearing, Defendant's December 16, 2020, memorandum in support, [Docket No. 34], failed to offer any specific argument whatsoever related to this Motion to Dismiss.   Therefore, on February 3, 2021, the Court issued its Report and Recommendation holding that, among other things, Defendant had abandoned his Motion to Dismiss, and in the alternative, that Defendant's argument was unpersuasive based on the generic argument that there was a lack of probable cause.  [Docket No. 42, at pp. 17-18].  Accordingly, the Court recommended dismissing Defendant's Motion to Dismiss. (Id.).

Following a change in defense counsel, an objection was filed.  The District Judge declined to adopt the Report and Recommendation, and remanded the matter for, among other things, "the issuance of a new Report and Recommendation," following a rehearing.   [Docket No. 53]. However, since the Court's earlier Report and Recommendation, [Docket No. 42], there has been

no change in circumstances and no new arguments advanced by Defendant.[15]  Accordingly, for all the reasons discussed in the Court's previous Report and Recommendation, [Docket No. 42], the undersigned again recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 24], be **DENIED**.

## IV.     CONCLUSION

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Defendant's Motion to Suppress Evidence, [Docket No. 55], be **DENIED**; and

2.  Defendant's Motion to Dismiss the Indictment, [Docket No. 24], be **DENIED**.

Dated: September 17, 2021                                        s/Leo I. Brisbois
                                                                Hon. Leo I. Brisbois
                                                                U.S. MAGISTRATE JUDGE

---

[15] See footnote 1, supra.

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.